NO. 07-03-0229-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



MARCH 23, 2004



______________________________




APRIL SOUND MANAGEMENT CORP., APPELLANT



V.



CONCERNED PROPERTY OWNERS FOR APRIL SOUND, INC., 



A TEXAS NON-PROFIT CORPORATION AND DEVELOPER FOR



APRIL SOUND SUBDIVISION, APPELLEE




_________________________________



FROM THE 221ST DISTRICT COURT OF MONTGOMERY COUNTY;



NO. 01-03-01815-CV; HONORABLE SUZANNE STOVALL, JUDGE



_______________________________




Before JOHNSON, C.J., and REAVIS and CAMPBELL, JJ.



OPINION




 April Sound Management Corp. appeals from a judgment rendered on a traditional
motion for summary judgment declaring that Concerned Property Owners for April Sound,
Inc. (CPO, Inc.), as developer, may, pursuant to the deed restrictions applicable to the April
Sound Subdivision at any time and from time to time, adjust, alter, waive, discontinue, or
abandon all or any part of the maintenance charge, including without limitation, the
recreational charge and the possible "additional" charge as set forth in the deed restrictions
applicable to the various sections within the April Sound Subdivision. The judgment further
declares that should CPO, Inc., as developer, discontinue or abandon the recreational
charge, then there can be no basis for any "additional" charges to be added to the
recreational charge. By its issues, (1) Management Corp. questions whether (1) the FDIC
possessed any right of the original developer at the time the FDIC purportedly transferred
developer's rights to CPO, Inc.; (2) CPO, Inc. has any right, as a matter of law, to possess
or exercise rights reserved to the original developer as set forth within the deed restrictions,
and, if so; (3) it has the right, in its sole discretion, to adjust, alter, waive, discontinue, or
abandon all or any part of the maintenance charge set forth within the deed restrictions
when it has never held nor owned any property or interest in the subdivision; (4) the trial
court erred in refusing to abate the lawsuit until the lot owners in the subdivision and the
April Sound Property Owners Association were properly joined in the lawsuit; (5) the trial
court erred by granting declaratory relief when all persons who have or claim any interest
that would be affected by the declaration were not made parties to the lawsuit as required
by section 37.006 of the Texas Civil Practice and Remedies Code; (6) the trial court erred
by denying Management Corp.'s claims for declaratory relief; (7) the trial court erred by
eliminating Management Corp.'s rights held by virtue of the deed restrictions; (8) CPO, Inc.
established as a matter of law that there were no genuine issues of material fact precluding
summary judgment on its declaratory relief claims; (9) CPO, Inc. established as a matter
of law that there were no genuine issues of material fact that Management Corp. was not
entitled to recover on its claims for declaratory relief; and (10) the trial court erred in
denying Management Corp.'s motion for new trial. Based upon our analysis of issues four
and five, we reverse and render in part, and reverse and remand in part.

 The April Sound Subdivision (2) and the April Sound Country Club on Lake Conroe
were developed together in 1972 by joint venture comprised of Southwest Savings
Association as the original developer and other members to be part of a masterplanned
community. Among other provisions and features to serve the 2200 lots, the recorded
deed restrictions provided for the development's security, fire protection, streets, common
areas, and recreational amenities including a clubhouse with dining room facilities,
swimming pool, boat launching facilities, bridle trails, tennis courts, plus other facilities to
be developed from time to time. Southwest Savings subsequently changed its name to
United Savings Association of Texas, which was succeeded by the FDIC as manager of
the resolution fund. CPO, Inc. contends that after all or substantially all of the lots were
sold, pursuant to the provisions set forth in the deed restrictions, the FDIC transferred all
of the duties and prerogatives of the developer to CPO, Inc. 

 The deed restrictions contain provisions creating a maintenance fund by imposing
a maintenance charge to be assessed to each lot in the subdivision. As material here, per
section 6.01, each lot is subject to an annual maintenance charge which, according to
section 6.02, shall include amounts relating to recreational facilities payable monthly and
in advance to April Sound Recreation Corporation. Also, section 6.05 provides in part:

 The maintenance charges collected shall be paid into the Maintenance Fund
to be held and used for the benefit, directly or indirectly, of the subdivision;
and such Maintenance Fund may be expended by the Developer for any
purpose which, in the judgment of the Developer will tend to maintain the
property values in the subdivision . . . and the decision of the Developer with
respect thereto shall be final, so long as made in good faith.


According to section 6.08(a), the maintenance charge includes 

 a sum to be determined by the Board of Trustees of April Sound Property
Owners Association (such sum is hereinafter referred to as the "property
charge"), and a sum to be determined by the Board of Trustees of April
Sound County [sic] Club (such sum is hereinafter referred to as the
"recreational charge"). The Recreational Corp. may add sum [sic] additional
sum to the Maintenance Charge as in its judgment is necessary to carry out
the objectives for which the Maintenance Charge is to be used and such
additional sum shall be deemed to be part of the "recreational charge. . . ."
The recreational charge shall be secured by the lien referred to in paragraph
8.06 hereof. 


Then, in section 6.09, after recognizing the right of the "Board of Directors of the April
Sound Recreation Corporation to determine and assess the exact amount of the
Maintenance Charge and Recreational Charge," the amount of the initial monthly charge,
including the recreational charge, is set at $12.00 per month. In summary, section 6 
designates and provides: 


 the "property" charge is to be determined by the Board of Trustees of
April Sound Property Owners Association;
 the "recreational charge" is to be determined by the Board of Trustees
of April Sound County [sic] Club (Recreation Corp.); 
 the monthly maintenance charge is payable to April Sound Recreation
Corp. and is secured by a lien per the covenants;
 the "exact amount of each maintenance charge" is to be determined
by the Developer; and
 the Board of Directors of the April Sound Recreation Corporation has
the "right" to "determine and assess the exact amount of the
Maintenance Charge and Recreational Charge."



 In the late 1970's Southwest Savings transferred its rights in the recreational
facilities and the maintenance fund to April Sound Recreational Corporation. 
Subsequently, Management Corp. purchased the recreational facilities. In connection with
the acquisition, Management Corp. commenced administering the operations of the April
Sound Property Owners Association and the subdivision infrastructure.

 Contending it had succeeded to the status and rights of the original developer by
the transfer from the FDIC, CPO, Inc., instituted this suit against Management Corp.
seeking declaratory relief that it has the right, power, and authority under the deed
restrictions to abandon the recreational charge component of the maintenance charge,
including the "additional sum" for operations of the recreational facilities at April Sound. 
Among other things, CPO, Inc. alleged that Management Corp. breached numerous
fiduciary duties to the property owners, wrongfully collected recreational charges in excess
of $15,000,000, and property charges in the amount of $4,764,834. CPO, Inc. also alleged
that at least $4,400,000 of trust funds were wrongfully used and converted by Management
Corp. CPO, Inc. did not, however, seek to recover any damages against Management
Corp. In addition to its general denial, by verified plea, Management Corp. asserted that
CPO, Inc. was not entitled to recover in the capacity in which it sued and that there was a
defect in parties because required persons or entities had not been made parties to the
suit. Also, as material here, Management Corp. alleged that declaratory judgment should
not be granted because all parties required for relief had not been joined and a judgment
or decree would not terminate the uncertainty or controversy.

 CPO, Inc. filed a traditional motion for summary judgment and without reciting the
specific grounds therefor, generally alleged that as movant it had succeeded to the rights
of the developer. The motion was supported by summary judgment evidence, authorities,
and briefing. Tex. R. Civ. P. 166a(c). Referencing the applicable deed restrictions, CPO,
Inc. sought a declaration that it had the right to discontinue all or any part of the
maintenance charge and discretion to discontinue and forever eliminate the recreational
and additional charges. Management Corp. filed its response to the motion together with
its motion to abate the proceeding. 

 Contending CPO, Inc. had not joined all necessary parties and that there was
another case pending, Management Corp. filed a second motion to abate. In this regard,
Management Corp. alleged that elimination of the recreational charge would result in
serious harm to each lot owner because each lot owner may be excluded from the club and
the potential loss of the club would seriously and irreparably injure the property values
within the subdivision. Citing sections 37.006(a) and 37.008 of the Texas Civil Practice
and Remedies Code (Vernon 1997), Management Corp. sought abatement of the case
which was denied by written order. The trial court also signed an order granting CPO,
Inc.'s motion for summary judgment, which remained interlocutory because the motion did
not address the counterclaim of Management Corp. CPO, Inc. then filed a motion for final
summary judgment addressing the counterclaim. The trial court did not award CPO, Inc.
damages nor attorney's fees, but declared that CPO, Inc., as developer, may, pursuant to
the deed restrictions, at any time, and from time to time, adjust, alter, waive, discontinue,
or abandon all or any part of the maintenance charge including without limitation, the
recreational charge and the possible "additional charge." The judgment further declared
that if CPO, Inc. discontinues or abandons the recreational charge, there can be no basis
for any "additional" charges to be added to the recreational charge.

 By its fourth issue, Management Corp. contends the trial court erred by refusing
to abate the lawsuit until the lot owners in the subdivision and the April Sound Property
Owners Association were properly joined in the lawsuit, and by its fifth issue, contends the
trial court erred by granting declaratory relief when all persons who have or claim any
interest that would be affected by the declaration were not made parties to the lawsuit as
required by section 37.006 of the Code. We agree and combine our analysis of the issues.

 Abatement of an action is proper where it is apparent that all parties whose interest
would be affected by the action have not been made parties. See Looney v. Sun Oil Co.,
170 S.W.2d 297, 300 (Tex.Civ.App--Texarkana 1943, writ ref'd w.o.m.) (holding that the
suit "in equity" should have been abated for want of necessary parties where it was
apparent that the interests of two parties would be affected by the suit). Here, without
joining the owners of the lots in the subdivision, CPO, Inc., sought and obtained an order
declaring that pursuant to the deed restrictions it could, at any time and from time to time,
adjust, alter, waive, discontinue, or abandon all or any part of the maintenance charge and
recreational charge. Section 37.006(a) of the Code entitled Parties provides:

 (a) [w]hen declaratory relief is sought, all persons who have or claim any
interest that would be affected by the declaration must be made parties. A
declaration does not prejudice the rights of a person not a party to the
proceeding.


(Emphasis added). The purpose of this section is to avoid a multiplicity of suits because
a declaratory judgment does not prejudice the rights of a person not a party to the
proceeding. Blythe v. City of Graham, 303 S.W.2d 881, 883 (Tex.Civ.App.-Fort Worth
1957, no writ). (3)

 "Must" creates or recognizes a condition precedent. Tex. Gov't Code Ann. §
311.016(3) (Vernon 1998); see Helena Chemical Co. v. Wilkins, 47 S.W.3d 486, 493 (Tex.
2001). Accordingly, if the owners of the lots in the subdivision "would be affected" by the
declaratory judgment sought and ordered, they "must" be joined as parties and, as in
Looney, the suit should have been abated. 170 S.W.2d at 300. Because there is no litmus
paper test to utilize in determining whether the lot owners should have been made parties,
we will consider the declaration made by the trial court in the context of the deed
restrictions and applicable property law. 

 "Property" is a word of comprehensive meaning and extends to every species of
valuable right and interest in real and personal property. Womack v. Womack, 141 Tex.
299, 172 S.W.2d 307, 308 (Tex. 1943). Also, a property interest consists not merely in its
ownership and possession, but includes the unrestricted right of use, enjoyment, and
disposal. Mann v. Risinger, 423 S.W.2d 626, 632 (Tex.Civ.App.--Beaumont 1968, writ
ref'd n.r.e.). The right to own and have exclusive dominion over private property is a
sacred one, and it is a universal principle of law that the right to own property carries with
it the right to control and dispose of it in such manner as not to contravene law or public
policy. See Ford v. Grand United Order of Odd Fellows, 50 S.W.2d 856, 859
(Tex.Civ.App.--Beaumont 1932, writ dism'd w.o.j.). The rules governing the amenities and
recreational facilities associated with the use and enjoyment of real estate should be
definite and certain so as to lend stability and predictability of land titles. In a concurring
opinion in Reed v. Wylie, 597 S.W.2d 743, 751 ( Tex. 1980), Justice Spears wrote:

 It is axiomatic that rules of property are not to be tampered with lightly or
easily changed. Persons rely on rules of property in the conduct of their
affairs and are entitled to depend on the stability of those rules without
periodic alterations occasioned by the changing winds of the day. 

 

Although Justice Spears was concerned with the question of whether lignite at the surface
was a mineral or part of the surface, his remarks concerning reliance on the controlling
rules or regulations and the need for predictability and stability also apply to the deed
restrictions.

 A detailed analysis of the deed restrictions is not required but in summary they
include provisions for architectural controls of buildings and structures, designation of lots
as either "Lakefront Lots" or "Town and Country Lots," and include general restrictions on
use, i.e., residential use, set back lines, and the like. Also, section V contains special
restrictions applicable to lakefront lots regarding piers, boat slips, walls, planters, and other
improvements. In addition, the maintenance, recreational, and property charges applied
to recreational features such as the clubhouse, swimming pool, boat launching facilities,
bridle trails, tennis courts, and other common areas, and were payable monthly and
secured by a lien on the lots. 

 Additionally, section VI includes detailed provisions for the determination of the
amount of the various charges. It allocates the authority to make certain determinations
and administrative decisions to the Board of Trustees of the April Sound Property Owners
Association, the Board of Trustees of April Sound Country Club, the April Sound
Recreational Corp., and the developer. It is significant to note that section 6.05 authorizes
the expenditure of funds in such a manner as "will tend to maintain the property values in
the subdivision," which involves the exercise of judgment and could have a significant
impact on property values of lots in the subdivision in the future. Construing the deed
restrictions in light of the intent of the plan for development of the subdivision, the
recreational opportunities presented by the development were designed to provide the
owners with significant rights, benefits, and recreational opportunities incidental to
ownership of property in the development. See Parker v. Delcoure, 455 S.W.2d 339, 343
(Tex.Civ.App.--Fort Worth 1970, writ ref'd n.r.e.); see also Brite v. Gray, 377 S.W.2d 223,
225 (Tex.Civ.App.--Beaumont 1964, no writ), 

 The general rule that some of the owners of property in a subdivision may not
release or modify applicable restrictions without the concurrence of others who own
property in the subdivision is grounded upon the vesting of rights and privileges in lots in
common with other lot owners in the subdivision. See Smith v. Williams, 422 S.W.2d 168,
172 (Tex. 1967). In Letsos v. Katz, suit was brought against the subdivision committee but
the court held that the individual lot owners had a joint interest with the committee and
were indispensable parties to the action. 489 S.W.2d 317, 319 (Tex.Civ.App.--Houston
[1st Dist.] 1972, no writ). 

 This action for declaratory judgment is not a suit against a lot owner to enforce
compliance with one or more lot restrictions which would not implicate rights of other lot
owners. Instead, it is an action for a declaration that the developer has the power to
adjust, alter, waive, discontinue, or abandon all or any part of the recreational charge
notwithstanding the provision in section 6.08(a) of the deed restrictions that the 
recreational charge is to be determined by the Board of Trustees of April Sound Country
Club (Recreational Corp.). Moreover, the payment of the charges, including the
recreational charge, is secured by a lien on the property.

 The declaratory relief sought by CPO, Inc. implicates significant incidental rights of 
the owners of lots in the subdivision, and in that context, presents a situation similar to the 
issues presented in Simpson v. Afton Oaks Civic Club, Inc., 117 S.W.3d 480, 483 (Tex.
App.--Texarkana 2003, pet. filed Nov. 6, 2003). (4) Simpson sought a declaratory judgment
to nullify the mandatory property owners' association. Concluding the declaratory relief
that Simpson sought would, in effect, change the rights and interests of each property
owner in the association, the court held that all property owners were necessary parties to
the suit and their absence divested the trial court of subject matter jurisdiction which could
be raised for the first time on appeal. Id. at 484. 

 Moreover, the underlying case may present one of those rare situations which
requires the presence of indispensable parties to the controversy whose absence deprives
the court of jurisdiction. See Travis Heights Imp. Ass'n v. Small, 662 S.W.2d 406, 413
(Tex.App.-Austin 1983, no writ); see also Nuchia v. Woodruff, 956 S.W.2d 612, 617
(Tex.App.--Houston [14th Dist.] 1997, pet. denied). Thus, considering that property rights
are fundamental and the benefits that would be achieved by stabilizing uncertainty
regarding deed restrictions, and because the interests of non-party lot owners would be
affected by the declaration, we hold the trial court erred in not granting Management
Corp.'s plea in abatement as required by section 37.006(a) of the Texas Civil Practice and
Remedies Code. Issues four and five are sustained. Our disposition of issues four and
five pretermits consideration of the remaining issues.

 Accordingly, the judgment of the trial court signed February 12, 2003, and the order
denying the second motion to abate of Management Corp. signed April 25, 2002, are
reversed; rendering the judgment the trial court should have rendered, the plea in
abatement of Management Corp. is granted. See Tex. R. App. P. 43.2 (c). Otherwise, the
cause is remanded to the trial court for further proceedings.


 Don H. Reavis

 Justice 
1. Management Corp. does not present an issue contending the trial court erred in
granting the motion for summary judgment as authorized by Malooly Brothers, Inc. v.
Napier, 461 S.W.2d 119, 121 (Tex. 1970).
2. According to CPO, Inc.'s brief, the subdivision is composed of "at least 17 different
sections," and by its original petition, CPO, Inc. alleged that each of the 17 sections was
subject to separate deed restrictions. CPO, Inc. alleges the 17 sets of restrictions are
identical "in pertinent part." However, the record presented here contains the reservations,
restrictions, and covenants for section five only. 
3. See Dahl v. Hartman, 14 S.W.3d 434, 436 (Tex.App.-Houston [14th Dist.] 2000,
pet. denied). Dahl, a subdivision resident, filed a declaratory judgment action against the
defendants, consisting of other residents who were seeking to renew deed restrictions and
form a property owners association. The defendants filed a plea in abatement claiming
that all 333 property owners were necessary parties who had not been served. The trial
court agreed and ordered Dahl to serve all affected property owners. When Dahl failed to
comply with the trial court's order, the case was dismissed. On appeal, the court held the
trial court did not abuse its discretion in dismissing Dahl's action. Id. at 437. 
4. In Simpson, the question of joinder of parties was not raised by plea in abatement
in the trial court but rather was raised as fundamental error for the first time on appeal. 
The opinion in Simpson had not been released when the trial court signed the order on
February 12, 2003.



lines-together;
 page-break-after:avoid;
 mso-outline-level:8;
 font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 mso-bidi-language:EN-US;}
p.MsoHeading9, li.MsoHeading9, div.MsoHeading9
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 9 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:9;
 font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoFootnoteText, li.MsoFootnoteText, div.MsoFootnoteText
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Footnote Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:10.0pt;
 font-family:"Calibri","sans-serif";
 mso-ascii-font-family:Calibri;
 mso-ascii-theme-font:minor-latin;
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:Calibri;
 mso-hansi-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
p.MsoHeader, li.MsoHeader, div.MsoHeader
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Header Char";
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoFooter, li.MsoFooter, div.MsoFooter
 {mso-style-priority:99;
 mso-style-link:"Footer Char";
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoCaption, li.MsoCaption, div.MsoCaption
 {mso-style-noshow:yes;
 mso-style-priority:35;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 mso-pagination:widow-orphan;
 font-size:9.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.MsoFootnoteReference
 {mso-style-noshow:yes;
 mso-style-priority:99;
 vertical-align:super;}
p.MsoTitle, li.MsoTitle, div.MsoTitle
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:15.0pt;
 margin-left:0in;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpFirst, li.MsoTitleCxSpFirst, div.MsoTitleCxSpFirst
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpMiddle, li.MsoTitleCxSpMiddle, div.MsoTitleCxSpMiddle
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpLast, li.MsoTitleCxSpLast, div.MsoTitleCxSpLast
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:15.0pt;
 margin-left:0in;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoSubtitle, li.MsoSubtitle, div.MsoSubtitle
 {mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Subtitle Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoAcetate, li.MsoAcetate, div.MsoAcetate
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Balloon Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoNoSpacing, li.MsoNoSpacing, div.MsoNoSpacing
 {mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraph, li.MsoListParagraph, div.MsoListParagraph
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpFirst, li.MsoListParagraphCxSpFirst, div.MsoListParagraphCxSpFirst
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpMiddle, li.MsoListParagraphCxSpMiddle, div.MsoListParagraphCxSpMiddle
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpLast, li.MsoListParagraphCxSpLast, div.MsoListParagraphCxSpLast
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoQuote, li.MsoQuote, div.MsoQuote
 {mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Quote Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:black;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoIntenseQuote, li.MsoIntenseQuote, div.MsoIntenseQuote
 {mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Intense Quote Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:.65in;
 margin-bottom:14.0pt;
 margin-left:.65in;
 line-height:115%;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD .5pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleEmphasis
 {mso-style-priority:19;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:gray;
 font-style:italic;}
span.MsoIntenseEmphasis
 {mso-style-priority:21;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleReference
 {mso-style-priority:31;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 text-decoration:underline;
 text-underline:single;}
span.MsoIntenseReference
 {mso-style-priority:32;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 letter-spacing:.25pt;
 font-weight:bold;
 text-decoration:underline;
 text-underline:single;}
span.MsoBookTitle
 {mso-style-priority:33;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 letter-spacing:.25pt;
 font-weight:bold;}
p.MsoTocHeading, li.MsoTocHeading, div.MsoTocHeading
 {mso-style-noshow:yes;
 mso-style-priority:39;
 mso-style-qformat:yes;
 mso-style-parent:"Heading 1";
 mso-style-next:Normal;
 margin-top:24.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.Heading1Char
 {mso-style-name:"Heading 1 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 1";
 mso-ansi-font-size:14.0pt;
 mso-bidi-font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 font-weight:bold;}
span.Heading2Char
 {mso-style-name:"Heading 2 Char";
 mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 2";
 mso-ansi-font-size:13.0pt;
 mso-bidi-font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading3Char
 {mso-style-name:"Heading 3 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 3";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading4Char
 {mso-style-name:"Heading 4 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 4";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.Heading5Char
 {mso-style-name:"Heading 5 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 5";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;}
span.Heading6Char
 {mso-style-name:"Heading 6 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 6";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 font-style:italic;}
span.Heading7Char
 {mso-style-name:"Heading 7 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 7";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.Heading8Char
 {mso-style-name:"Heading 8 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 8";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;}
span.Heading9Char
 {mso-style-name:"Heading 9 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 9";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.TitleChar
 {mso-style-name:"Title Char";
 mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Title;
 mso-ansi-font-size:26.0pt;
 mso-bidi-font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;}
span.SubtitleChar
 {mso-style-name:"Subtitle Char";
 mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Subtitle;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 font-style:italic;}
span.QuoteChar
 {mso-style-name:"Quote Char";
 mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Quote;
 color:black;
 font-style:italic;}
span.IntenseQuoteChar
 {mso-style-name:"Intense Quote Char";
 mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Intense Quote";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
p.NewDocument, li.NewDocument, div.NewDocument
 {mso-style-name:"New Document";
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 mso-bidi-font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;
 mso-bidi-language:EN-US;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 font-family:"Calibri","sans-serif";
 mso-ascii-font-family:Calibri;
 mso-ascii-theme-font:minor-latin;
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:Calibri;
 mso-hansi-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
span.SpellE
 {mso-style-name:"";
 mso-spl-e:yes;}
span.GramE
 {mso-style-name:"";
 mso-gram-e:yes;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 font-size:10.0pt;
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:Arial;
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:Arial;}
 /* Page Definitions */
 @page
 {mso-footnote-separator:url("07-09-0214.cr%20opinion_files/header.htm") fs;
 mso-footnote-continuation-separator:url("07-09-0214.cr%20opinion_files/header.htm") fcs;
 mso-endnote-separator:url("07-09-0214.cr%20opinion_files/header.htm") es;
 mso-endnote-continuation-separator:url("07-09-0214.cr%20opinion_files/header.htm") ecs;}
@page Section1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-page-numbers:1;
 mso-title-page:yes;
 mso-footer:url("07-09-0214.cr%20opinion_files/header.htm") f1;
 mso-paper-source:0;}
div.Section1
 {page:Section1;}
@page Section2
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-title-page:yes;
 mso-footer:url("07-09-0214.cr%20opinion_files/header.htm") f2;
 mso-paper-source:0;}
div.Section2
 {page:Section2;}
-->








NO. 07-09-00214-CR

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL A

 



MAY
27, 2010

 



 

JESSIE C. HERNANDEZ, JR., APPELLANT

 

v.

 

THE STATE OF TEXAS, APPELLEE 



 



 

 FROM THE COUNTY COURT AT LAW NO. 1
OF LUBBOCK COUNTY;

 

NO. 2008-449,976; HONORABLE LARRY B. "RUSTY" LADD, JUDGE



 



 

Before CAMPBELL
and HANCOCK and PIRTLE, JJ.

 

 

MEMORANDUM OPINION

 

 

Appellant, Jessie C. Hernandez, Jr.,
appeals his conviction, based on a jury verdict, for the offense of
assault/domestic violence[1]
and sentence of 365 days incarceration in the Lubbock County Jail.  We affirm.

Background

            On
February 23, 2008, appellant and his long-time girlfriend and mother of his
children, Elisavet Evet
Arias, went out for a night of dancing. 
During the evening, appellant and Evet drank
alcohol, and Evet became intoxicated.  At some point during the night, appellant and
Evet got into an argument.  The argument escalated during the drive to
appellants mothers home, where appellant was living.  The argument continued in the front yard of
appellants mothers home.  Appellants
sister, Tracy Hernandez, and appellants mother, Mary Hernandez, went out to
the front yard.  Mary observed that Evet had sustained injuries to her face, specifically that
the area around her eyes was swollen. 
Tracy saw blood on Evets face, but did not
know what had happened.  Eventually,
appellant began arguing with Tracy and, during this argument, appellant punched
out the rear window of Tracys vehicle. 
Tracy was able to convince Evet to leave in
order to get appellant to calm down. 
Tracy called 911 to ask for police assistance because her brother was
intoxicated, out of control, and had beaten up his girlfriend.  

            Evet drove to her mothers house, where she was
living.  During the drive, Evet called her cousin, Kassey
Reyes, and, while crying hysterically, told Kassey
that appellant had beaten her up.  Upon
entering her mothers house, Evets mother, Andi Arias, was awoken. 
When Andi saw Evet
crying uncontrollably and noticed that she was bleeding, Andi
called 911 to find out what had happened. 
However, in this call, Andi told the 911
operator that Evets boyfriend had beaten her up,
that her face was all beat up, and her knee was cut.  Soon after Evet
arrived at the house, Kassey arrived.  Kassey observed
that Evets hair was messed up, she had bruises all
over her face, she had scratches on her arms, and her leg was cut and bleeding.

            Lubbock
Police Corporal Timothy Spann was dispatched on a domestic violence call on
February 23, 2008.  He first went to Mary
Hernandezs residence.  When he arrived,
he saw two females and a male outside, heard a lot of hollering and screaming,
observed that the males hand was bleeding profusely, and saw that the rear
window of one of the vehicles was broken. 
Spann spoke with appellant who explained that his hand was bleeding
because he had punched the car window. 
While Spann was speaking with appellant, he received another call from
dispatch reporting that a woman had called to report that her daughter had been
assaulted.  Dispatch further informed
Spann that the parties of this second call were related to the parties of the
first call.  When Spann informed
appellant that he was going to the Arias residence, appellant put his hands on
the car and said, Forget it, I am going to jail anyways.  Take me to jail.  

            Spann
left other officers at the Hernandez residence and proceeded to the Arias
residence.  Spann spoke with Evet and observed that the area of her face from her nose
to her chin was bloody.  Spann also
observed that Evets nose appeared swollen and her
upper lip was extremely swollen.  In
response to Andi and Kassey
claiming that appellant had beaten Evet up, Evet stated that appellant did not beat her up, but had hit
her.  

Evet then told Spann about the events of
the evening.  She stated that she and
appellant had gotten into an argument at Club Rico and that he had decided to
leave with some friends.  While she was
sitting at the bar of the club, another man bought her a drink.  Appellant apparently saw this, walked up
behind Evet, and thumped her on the back of the
head.  Appellant then told her to take
him home.  Evet
complied and followed appellant into the parking lot.  When they approached the vehicle, appellant
turned around and punched her in the nose. 
Evet said that she could not recall exactly
how many times appellant punched her, but it was at least four times.  Evet explained that
she injured her knee when she fell after appellant hit her.

After obtaining this statement from Evet, Spann radioed the officers at the Hernandez residence
and told them to place appellant under arrest. 
When Spann informed Evet that appellant was
being placed under arrest, she said, No, no, no, he is going to blame
everything on me.  Evet
then changed her story and told Spann that her injuries were the result of a
fall.

On April 10, 2008, appellant was
charged by information with the offense of assault/domestic violence.  On July 24, 2008, Evet
filed an Affidavit of Non-Prosecution in which she attested that she had simply
fallen on February 23, 2008, and that appellant did not hit her.  However, approximately one year after the
February 23, 2008 incident, Evet called the Lubbock
Police about another incident between her and appellant and, in this
conversation, she referenced the incident in February 2008 and indicated that
her babys father had beat her ass . . . at a club.  Then, at trial, Evet
testified that she had simply tripped and fallen in the parking lot of the club
and had hit her knee and face on the asphalt and that appellant had not hit
her.  After hearing all of the evidence,
the jury returned a verdict finding appellant guilty of the offense as charged
in the information.  The jury also heard
the punishment evidence and assessed appellants punishment at 365 days
incarceration in the Lubbock County Jail.

By one issue, appellant appeals. 
Appellant contends that the evidence is both legally and factually
insufficient to support his conviction.  As
appellant challenges both the legal and factual sufficiency of the evidence, we
are required to conduct an analysis of the legal sufficiency of the evidence
first and, then, only if we find the evidence to be legally sufficient, do we
analyze the factual sufficiency of the evidence.  See Clewis
v. State, 922 S.W.2d 126, 133 (Tex.Crim.App.
1996).

Legal Sufficiency

            In assessing the legal sufficiency of the evidence, we
review all the evidence in the light most favorable to the verdict to determine
whether any rational trier of fact could have found
the essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560
(1979); Ross v. State, 133 S.W.3d 618, 620 (Tex.Crim.App.
2004).  In conducting a legal
sufficiency review, an appellate court may not sit as a thirteenth juror, but
rather must uphold the jurys verdict unless it is irrational or unsupported by
more than a mere modicum of evidence.  Moreno v. State, 755 S.W.2d 866, 867 (Tex.Crim.App.
1988).  

            In the present case, the jury heard evidence that Evets story of the events of February 23, 2008, as
recounted on February 23, 2008, was that she and appellant got into an argument
and appellant punched her in the face at least four times.  Additionally, Evets
injuries are far more consistent with having been struck by a fist than as the
result of a fall.  Further, the evidence
establishes that Evets multiple accounts of the
events of February 23, 2008, consistently indicate that appellant hit her until
Spann informed Evet that appellant had been arrested,
when Evet, for the first time, indicated that her
injuries were the result of a fall.

            Viewing all of the evidence in the light most favorable
to the verdict, we find that the evidence is sufficient to allow a rational
jury to find the essential elements of the offense for which appellant was
charged to be true beyond a reasonable doubt. 
See Jackson, 443 U.S. at 319; Ross, 133 S.W.3d at 620.  As
such, we conclude that the evidence supporting appellants conviction is
legally sufficient.

Factual
Sufficiency

            When an appellant challenges the factual sufficiency of
the evidence supporting his conviction, the reviewing court must determine
whether, considering all the evidence in a neutral light, the jury was
rationally justified in finding the appellant guilty beyond a reasonable
doubt.  See Watson v. State,
204 S.W.3d 404, 415 (Tex.Crim.App.
2006).  In performing a factual
sufficiency review, we must give deference to the fact finders determinations
if supported by evidence and may not order a new trial simply because we may
disagree with the verdict.  See id.
at 417.  As an
appellate court, we are not justified in ordering a new trial unless there is
some objective basis in the record demonstrating that the great weight and
preponderance of the evidence contradicts the jurys verdict.  See id.  Additionally, an appellate opinion addressing
factual sufficiency must include a discussion of the most important evidence
that appellant claims undermines the jurys
verdict.  Sims v.
State, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).  However, when a defendants version of the
facts conflicts with other evidence, it is the jurys prerogative to judge the
credibility of the evidence and to ascribe the weight to be given to the
evidence.  Jones v.
State, 944 S.W.2d 642, 647-48 (Tex.Crim.App.
1996).  

            By his factual sufficiency challenge, appellant contends
that the jury should have believed Evets subsequent
statements that she fell as opposed to her initial statements that appellant
hit her in the face.  While Evets versions of the events of February 23, 2008, did
conflict, it is the jurys prerogative to assess the credibility of the
evidence and to ascribe the weight to be afforded the evidence.  Id. 
As there is evidence to support the jurys determinations, even were we
to disagree with the jurys verdict, we may not reverse the judgment and remand
the case for a new trial.  See Watson,
204 S.W.3d at 417.

            Reviewing all of the evidence in a neutral light, we find
that the evidence is sufficient to have allowed the jury to rationally find the
appellant guilty beyond a reasonable doubt. 
See id. at 415.  As such, we conclude that the evidence
supporting appellants conviction is factually sufficient.

Conclusion

            Concluding that the evidence supporting appellants
conviction was both legally and factually sufficient, we overrule appellants
sole issue and affirm the judgment of the trial court.

 

                                                                                                Mackey
K. Hancock

                                                                                                            Justice

Do not publish.         








 











[1]
See Tex. Penal Code Ann. § 22.01 (Vernon Supp. 2009).